**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| **SHBD, LLC, BARBARA O'NEILL, and MICHAEL O'NEILL** | § § § | |
| **v.** | § | **No. 4:25-CV-00183-WMR** |
| **EMMA M. LOBERG, MISTY MOUNTAIN USA LLC, AND BARBARAONEILL.COM LLC** | § § § § | |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**[1]

Defendants Emma Loberg, Misty Mountain USA LLC, and BarbaraOneill.com LLC (collectively, "**Defendants**"), by and through their undersigned counsel, appearing specially and without submitting to the jurisdiction or venue of the Court for the sole purpose of defending against Plaintiffs SHBD, LLC, Barbara O'Neill and Michael O'Neill's (collectively, the "**Plaintiffs**") Motion for a Temporary Restraining Order and Preliminary Injunction (the "**Motion**") file

[1] This Opposition is submitted pursuant to the Court's Notice of Hearing dated July 17, 2025 and should not be construed as Defendants' consent or agreement that jurisdiction or venue is proper in this Court. Defendants reserve all defenses, including their rights to challenge jurisdiction and venue, as set forth in their simultaneously filed Motion to Dismiss.

this Brief in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.[2] In support thereof, Defendants show the Court as follows:

**INTRODUCTION**

For more than two years, the parties were involved in a seamless family venture, not a legal controversy. Since around 2015, Defendant Emma Loberg ("**Emma**") had informally served as the family's U.S.-based logistics coordinator for Plaintiff Barbara O'Neill's ("**Barbara**") books.[3] Operating out of her home in Baldwin, Wisconsin, Emma routinely received pallets of Barbara O'Neill books, packed shipments, and sent inventory to Amazon fulfillment centers whenever stock ran low. Declaration at ¶5. At first, demand on Amazon, particularly in the North American market, was steady but modest, with Emma shipping six to eight cases every two to three months. *Id* at ¶6. That changed in early 2023, when on three separate occasions, what was expected to be a two-to-three-month supply sold out overnight. *Id* at ¶7. Emma responded by sending twenty cases, but Amazon misplaced the entire consignment. *Id* at ¶7. With customer demand surging and supply unreliable, a new plan took place. Given Emma's proven management skills and logistical experience, she, Barbara, and Plaintiff Michael O'Neill ("**Michael**")

---

[2] As this case is currently under seal, counsel does not currently have access to the Docket Numbers for certain documents and only has the unstamped copies of the documents provided by Plaintiffs' counsel.

[3] *See* Exhibit A (the "**Declaration**")

agreed that Emma would establish and operate a direct-to-consumer e-commerce website from Wisconsin to ensure dependable distribution of the books. *Id* at ¶8.

To facilitate operations and to incentivize Emma to take on the considerable workload and responsibility, Barbara and Michael orally granted her, and Emma accepted, the exclusive right to print, market, and sell Barbara O'Neill-authored health-education books within Canada, the United States, and Mexico (the "**North America Market**"), and worldwide (at the time, Michael in Australia was not doing any international shipping), in exchange for a percentage of net sales, while reserving for themselves control over sales and distribution in all other jurisdictions. Declaration at ¶¶9-10. In addition, Barbara and Michael consented to Emma selling—and being the source of—BARBARA O'NEILL-branded merchandise and did not request or require any share of profits from those merchandise sales. *Id*.

In furtherance of the parties' agreement, on June 30, 2023, Emma formed Defendant Misty Mountain USA LLC in Wisconsin. *Id* at ¶12. She launched mistymountainusa.com, secured payment processing for sales on the site, and began selling Barbara O'Neill-authored books along with a small line of BARBARA O'NEILL-branded herbal teas, skin-care creams, and other products. *Id* at ¶13.

Sales exploded. Traffic volume forced Emma to retain a dedicated IT contractor in August 2023, and in January 2024 she approached Michael about purchasing the BarbaraOneill.com domain outright so she could continue scaling the

North America Market operation while her parents continued to serve Australia and other business partners worldwide. *Id* at ¶18. Michael verbally agreed, and Emma purchased the BarbaraOneill.com domain in January 2024 for $10,000 to consolidate and strengthen promotion and distribution throughout North America. She then developed the BarbaraOneill.com website and launched it on or about May 11, 2024. *Id* at ¶19.

As is evident, Emma invested in and built the BARBARA O'NEILL North America Market business from the ground up, essentially becoming a publishing house for the Barbara O'Neill authored health-education books, paying all printing and fulfillment costs for the books, and being the producer of BARBARA O'NEILL-branded merchandise, which later became EMMA MAGNOLIA-branded merchandise. Per the parties' oral agreement, Defendants paid Barbara and Michael on monthly or bi-monthly basis for the sales generated by Defendants printing, marketing and selling Barbara O'Neill-authored books in the North American Market, totaling no less than $1,230,004.65 US Dollars from October 2023 to early 2025. *Id* at ¶11. The Plaintiffs deposited every payment made to them by Defendants. *Id*.

To formalize the ownership and business arrangement the family had followed for nearly two years, on February 3, 2025, Barbara executed the Intellectual Property Assignment Agreement (attached to the Complaint as Exhibit A (the

"**Assignment**")) transferring all North American Market copyrights, trademarks, and publicity rights to Misty Mountain USA LLC; those rights were later conveyed to Defendant BarbaraOneill.com LLC.[4]

Contrary to Michael's exaggerated narrative of a devious daughter exploiting an exhausted mother under the guise of a "sinister massage," the facts are straightforward. Barbara had arrived from Dubai the previous day and filmed for several hours earlier that afternoon; she was understandably tired. As she relaxed on her bed after a shower, Emma sat beside her and explained that a written assignment was necessary to confirm Emma's ownership of the U.S. trademark and copyright. *Id* at 22. With a notary present via Zoom, Barbara signed the document. *Id*. Over the next hour and a half, Emma detailed every reason the paperwork was needed. Far from being coerced or confused, Barbara confirmed—both verbally and in writing—that the Assignment simply memorialized the oral agreement the family had honored since 2023. *Id*.

After learning about bad faith trademark filings for BARBARA O'NEILL at the United States Patent and Trademark Office ("**USPTO**") by a Chinese company, Defendants sought to obtain further protection for the BARBARA O'NEILL brand by filing a federal trademark application for BARBARA O'NEILL on February 28,

[4] BarbaraOneill.com LLC is owned and operated by Defendant Emma Loberg. Declaration at ¶4.

2025, with the USPTO (Serial No. 99061418). *See* 12 (Defendants' Trademark Application).

Rather than finalize a written profit-sharing agreement that was intended to complete the agreed upon ownership and business arrangement, Michael incorporated a competing shell company, Plaintiff SHBD LLC, on October 9, 2024, qualified it to do business in Wyoming on March 4, 2025, and—nine days later—filed his own copycat trademark application for BARBARA O'NEILL on March 13, 2023, with the USPTO (Serial No. 99082999). *See* Exhibit C (Plaintiffs' Trademark Application).

After those maneuvers, Plaintiffs suddenly came to this Court, under seal, in a District with no meaningful connection to the parties, seeking, without notice, a sweeping TRO to seize Defendants' domain, product inventory, and social-media channels, and in the same filing, a preliminary injunction to keep those severe restraints in place through trial.

## ARGUMENT AND CITATION OF AUTHORITY

TROs and preliminary injunctions are among the most drastic remedies available and should only be granted in the rarest of circumstances, and only upon a showing of clear necessity. *W.S. v. Ragsdale*, 540 F. Supp. 3d 1215, 1218 (N.D. Ga. 2021) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). To obtain such extraordinary relief, the movant bears the burden of clearly

establishing: (1) its claims have a substantial likelihood of success on the merits; (2) it will suffer irreparable injury absent injunctive relief; (3) the threatened injury to the movant outweighs any potential harm that might result to the opposing party; and (4) granting the injunction will not disserve the public interest. *Id*.

**A. Plaintiffs' Cannot Show the Assignment was Unconscionable**

Whether a contract is unconscionable is evaluated based "on the circumstances existing at the time the contract was made, rather than those existing . . . later." *Results Oriented, Inc. v. Crawford*, 245 Ga. App. 432, 439 (2000), *aff'd,* 273 Ga. 884, 548 S.E.2d 342 (2001) (citing *W.J. Cooney, P.C. v. Rowland,* 240 Ga. App. 703, 704 (1999)). An unconscionable contract is "abhorrent to good morals and conscience and is an agreement in which one of the parties takes a fraudulent advantage of another." *PruittHealth-Augusta, LLC v. Lyell*, 362 Ga. App. 799, 802 (2022) (internal quotations omitted). There are two forms of unconscionability: substantive and procedural. *Id*. Substantive unconscionability "looks at the contractual terms themselves[,]" whereas procedural unconscionability "considers the process of making the contract." *Id*.

Georgia courts hold parties to the contracts they sign. "[P]arties to a contract are presumed to have read their provisions and to have understood the contents. One who can read, must read, for he is bound by his contracts. While a legal excuse, such as fraud, may be shown for failing to read, the fraud must prevent the party from

reading the contract." *CL SNF, LLC v. Fountain*, 364 Ga. App. 371, 374, (2022) (quoting *Wright v. Safari Club Intl*., 322 Ga. App. 486, 493(4) (2013)). "One not prevented from reading the contract, and having the capacity and opportunity to do so, cannot after signing it claim he was fraudulently induced to sign by promises which contradict the express terms of the contract." *Hovendick v. Presidential Financial Corp.*, 230 Ga. App. 502, 504-505(2) (1998).

Georgia law also makes clear that contracts are not unconscionable merely because they are unreasonable, unfavorable or may lead to hardship. *See, e.g., Thomas v. T & T Straw, Inc.*, 254 Ga. App. 194, 195 (2002) ("Georgia law recognizes and protects the freedom of parties to contract.") (internal citations omitted). And hearsay evidence offered to prove unconscionability is insufficient. *Results Oriented*, 245 Ga. App. at 439.

Additionally, claims based on ancillary issues, such as a party not receiving a copy of the executed agreement, "is not evidence of unconscionability in the making of the agreement." *See Fountain*, 364 Ga. App. at 375; *see also Lyell*, 362 Ga. App. at 802. However, courts do consider the location of the party's signature on a document when assessing an argument of unconscionability. For example, in *Megel*, the court rejected the argument that Megel merely signed blank signature pages, as the signatures in the agreement at issue immediately followed tilted paragraphs with

sections, making it clear that the document contained multiple pages. See *Megel v. Donaldson,* 288 Ga. App. 510, 514 (2007).

By arguing that Barabra O'Neill did not know what she was signing when she signed the Assignment, Plaintiffs have made an allegation of procedural unconscionability. Plaintiffs have not alleged that Barbara O'Neill cannot read or is otherwise incapacitated or disabled, which would not permit her to be able to read. Plaintiffs also do not allege that Emma's purported fraud prevented Barbara O'Neill from reading the terms of the Assignment; Plaintiffs merely allege that Barbara O'Neill was "weary" and tired from traveling. Accordingly, any such arguments fail, and it is presumed that Barbara O'Neill read, or at least was able to read, the Assignment.

Moreover, as in *Megel*, Barbara O'Neill's signature does not appear on a blank signature page. Rather, Barbara O'Neill's signature appears on the same page as the title of the agreement and all of its terms. This factor weighs in favor of the position that the Assignment is not unconscionable. Finally, even if the terms of the Assignment favor Emma or any of the Defendants, this factor does not weigh in favor of, and certainly does not prove, unconscionability.

Plaintiffs have failed to establish that the agreement is unconscionable.

**B. Plaintiffs' Cannot Show Imminent Irreparable Harm**

Plaintiffs are not entitled to injunctive relief, temporary, preliminary or otherwise, because they have failed to demonstrate the absence of an adequate remedy of law—a threshold requirement for establishing irreparable injury. *Dongshin Motech Co. v. Kang*, No. 1:20-cv-02284-SCJ, 2020 U.S. Dist. LEXIS 143141, at *5, 2020 WL 4548715 (N.D. Ga. June 8, 2020). As the Courts in this District have repeatedly held, injunctive relief is reserved for situations where no adequate legal remedy exists. *Id*. Lawsuits seeking the recovery of money damages, like this one, do not qualify. *Id*.

Indeed, Plaintiffs' prayer for relief devotes more than a full page outlining all the ways it is entitled to monetary damages, emphasizing the compensatory nature of their alleged injuries. While Plaintiffs now attempt to rebrand their request for injunctive relief as a necessary means to "regain control" of Barbara O'Neill's name, that assertion collapses under scrutiny. The record makes it clear that Defendants have openly used Plaintiff's name to promote, market and sell books and related products since at least 2023, without objection. Plaintiffs' acquiescence and collaboration with Defendants until they filed this action speaks volumes.

A claim of "imminent" and "irreparable" harm simply cannot stand when the very conduct at issue has been ongoing for years, or at the very least since the Assignment was executed six months ago on February 3, 2025. Courts have

consistently held that even a modest delay is incompatible with the urgency required for injunctive relief, especially a temporary restraining order. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248-49 (11th Cir. 2016) (five-month delay was detrimental to plaintiff's request for injunctive relief); B*ethune-Cookman v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 22-14257, 2023 U.S. App. LEXIS 13260, at *11 (11th Cir. May 30, 2023) (six-month delay was fatal to plaintiff's request for injunctive relief). This is because the very idea of injunctive relief is premised on the need for speedy and urgent action to protect a party's rights before the case can be resolved on its merits. *Id*. Plaintiffs' delay not only undercuts that premise, it confirms the absence of any such threat. Accordingly, Plaintiffs cannot satisfy this prong.

**C. Plaintiffs' Cannot Show a Substantial Likelihood of Success of a Claim**

Plaintiffs also fail to establish a substantial likelihood of success for any of their claims. Count One of Plaintiffs' Complaint, which alleges fraud in the Assignment, collapses under the weight of the record. It is undisputed that, from October 2023 through early 2025, Plaintiffs received monthly or bi-monthly payments totaling no less than $1,230,004.65 US Dollars from sales generated by Defendants printing, marketing and selling Barbara O'Neill-authored books in the North American Market. Such conduct is not merely consistent with Plaintiffs'

knowledge and acceptance of Defendants' activities, it is affirmative ratification of the Assignment.

It is well settled that a party who knowingly accepts the benefits of an allegedly fraudulent transaction cannot later claim fraud. *Nalley v. Langdale*, 319 Ga. App. 354, 365, 734 S.E.2d 908, 918 (2012); *Harbaugh v. Greslin*, No. 03-61674-CIV-COHN/S, 2004 U.S. Dist. LEXIS 28598, at *28 (S.D. Fla. Dec. 13, 2004). As the Eleventh Circuit Court of Appeals has explained, ratification occurs where a party accepts the benefits of an arrangement and affirmatively elects to adopt it. *Irvine v. Cargill Investor Services, Inc.*, 799 F.2d 1461, 1464 (11th Cir. 1986). That is precisely what occurred here.

Further, Plaintiffs have never developed, manufactured, or controlled the goods sold in the North American Market. They cannot now credibly assert trademark ownership over commercial activity they neither controlled nor contributed to. Trademarks arise from use, not registration. *Iancu v. Brunetti*, 588 U.S. 388, 421, 139 S. Ct. 2294, 2316 (2019). Here, it is undisputed that Defendants, not Plaintiffs, have continuously used the BARBARA O'NEILL mark in commerce, with full control over the associated products, in the North American Market.

Plaintiffs' own Complaint confirms the permissive nature of the parties' relationship: "Barbara O'Neill gave permission for a trademark registration of her name, dated July 16, 2024. A copy of this permission form is attached as Exhibit C."

(Compl. ¶22). That admission alone weakens any assertion that the Assignment was unauthorized or improperly obtained.

In sum, Plaintiffs cannot now disavow an arrangement they knowingly accepted, authorized and profited from for years, especially after they received over one million dollars in proceeds pursuant to its terms. Their fraud allegations are contradicted by their own conduct and documentary admissions. Accordingly, Plaintiffs cannot show a substantial likelihood of success on the merits for Count One.

The same is true for Counts Two and Three. Count Two alleges that Defendants' operation of a website featuring Barbara O'Neill's name, their application for a trademark in her name and sale of her authored books creates a false impression of endorsement or association. (Compl. ¶¶ 47-51). Count Three[5]

[5] To the extent Count Three makes a claim that falls within the subject matter of copyright protection, it is preempted by federal law. Under 17 U.S.C. § 301(a) "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright specified by 17 U.S.C. § 106 are governed exclusively by the Copyright Act." *Fuss v. Bensch*, 601 F. Supp. 3d 1329, 1332 (N.D. Ga. 2022) ("the logo that Plaintiffs designed would surely qualify" as an issue within the subject matter of copyright set forth in 102 and 103); *see also Ray v. ESPN, Inc.*, 783 F.3d 1140, 1142 (8th Cir. 2015) (finding that pro-wrestlers claims for invasion of privacy, misappropriation of name, infringement of the right of publicity, and interference with prospective economic advantage as a result of ESPN's re-telecasting of his filmed performances were preempted by Copyright Act). Similarly, to the extent Plaintiffs' Count Three is based on the use or display of Barbara O'Neill's recorded speeches, books, or other copyrightable content, such claim

similarly claims under state law that Defendants have used Barbara O'Neill's name and likeness to advertise their products and gain the public's trust. (Compl. ¶¶ 56-57). But these claims ignore the express permission and the long-standing course of dealings between the parties.

As noted above, Plaintiffs permitted the use of the name "Barbara O'Neill" for trademark purposes, and they accepted substantial ongoing payments from the very sales they now challenge. The website, the branding and the promotional efforts were never hidden, they were part of an open, collaborative arrangement that Plaintiffs endorsed and benefited from. On this record, Plaintiffs cannot show a substantial likelihood of success on the merits for Counts Two or Three.

Finally, Count Four is a simple claim for monetary damages. It alleges that Plaintiffs are owed payments for books that Plaintiffs provided Defendants from March 2025 and April 2025. But as noted above, claims that can be resolved by money alone are not proper grounds for injunctive relief.

### D. The Balance of Harms and Public Interest Weights In Favor of Defendants

The balance of the harms test requires that the plaintiff establish that the harm it would suffer in absence of an injunction outweighs the harm that might befall the

---

governed exclusively by federal copyright law and cannot support a separate state-law cause of action.

non-moving party if the injunction is granted. *Tillman v. Miller*, 917 F. Supp. 799, 801 (N.D. Ga. 1995). Plaintiffs cannot meet their burden under this prong.

As explained above, Plaintiffs' alleged injuries are fully compensable through monetary relief. Denying the injunction would merely preserve the parties' status quo that has been in place since at least 2023. Granting the injunction, by contrast, would abruptly dismantle Defendants' operations, which serve as the only functional North American Market supply chain for Barbara O'Neill's books. It would halt the fulfillment of thousands of customer orders, leave Wisconsin warehouse employees without a job, and choke off the primary source of income for Defendants. *Golden Bear Int'l, Inc. v. Bear U.S.A., Inc.*, 969 F. Supp. 742, 748 (N.D. Ga. 1996) (denying injunction because "requiring Defendant to change its logo . . . would result in the loss of goodwill and possibly cause the failure of Defendant's business").

Plaintiffs, by contrast, would gain technical control of the trademark, but at the cost of the very revenue they now receive from Defendants' ongoing sales. Their alleged harm, if any, can be fully addressed through monetary damages, such that even if Plaintiffs were to prevail in this action, any disputed funds could be escrowed or awarded as part of a final judgment, eliminating any risk of under-compensation. Under these facts, the equities tilt sharply in favor of maintaining the current arrangement and denying injunctive relief.

**E. Plaintiffs' Failure to Provide Security is Detrimental to Request for TRO**

Should the Court impose any restraint —whether a TRO that lasts days or a preliminary injunction that could last through trial— Rule 65(c) makes security mandatory: an injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Unlike state court, a federal court is required to condition the granting of an injunction upon the giving of security by the applicant. *Sherman v. Bank of Am. Corp.*, No. 1:12-cv-03089-CC-RGV, 2014 U.S. Dist. LEXIS 205095, at *20 (N.D. Ga. July 16, 2014) (where the plaintiff had "not offered to tender any amount as security in this case, the Court may not enter a preliminary injunction pursuant to Rule 65"); *see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 297 F.R.D. 633, 636 (N.D. Ala. 2014) ("To deny a [security] bond [under Rule 65(c)] would not only be abusing this court's discretion. It would be flagrantly disregarding a binding rule."). Since Plaintiffs have not offered to tender any amount as a security for a TRO or preliminary injunction, the Court may not issue a TRO or preliminary injunction even if the other factors were in Plaintiffs' favor.

While there is a subset of cases that permits an injunction to issue without a bond, those cases are reserved for situations where the risk of harm to the enjoined party is minimal, speculative, or where the movant has demonstrated an

overwhelming likelihood of success on the merits. This is not such a case. Here, where granting an injunction would result in the cessation of Defendants' ability to operate its business, a security bond would be necessary. *Onaxis Franchising Grp., Ltd. Liab. Co. v. Harod*, No. 1:23-CV-4835-MHC, 2023 U.S. Dist. LEXIS 243197, at *48 (N.D. Ga. Dec. 28, 2023).

Because Plaintiffs have not offered to post any bond, the Court has an additional reason to not issue injunctive relief.

## CONCLUSION

Based on the foregoing, Defendants request the Court deny Plaintiffs' for a Temporary Restraining Order and Preliminary Injunction.

DATED: July 28, 2025.

By: */s/ April Meeks*
*Local Counsel*
Anuj Desai (Bar No. 193889)
anuj.desai@agg.com
April Meeks (Bar No. 963911)
april.meeks@agg.com

ARNALL GOLDEN GREGORY LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
Tel: 404.873.7037

Derek R. Staub (*pro hac vice forthcoming*)
State Bar No. 24063017
dstaub@fbtlaw.com
Amy E. Lavalle (*pro hac vice forthcoming*)

State Bar No. 24040529
alavalle@fbtlaw.com

Frost Brown Todd LLP
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: 214.580.5826

**COUNSEL FOR DEFENDANTS EMMA M. LOBERG, MISTY MOUNTAIN USA LLC, and BARBARAONEILL.COM LLC**

**LOCAL RULE 5.1(C) CERTIFICATION**

Pursuant to Northern District of Georgia Local Rule 7.1(D), the undersigned certifies that this Proposed Order has been prepared in Times New Roman, 14-point type, one of the fonts and point sizes approved by the Court.

DATED: July 29, 2025.

*/s/ April Meeks*

April Meeks