# EXHIBIT D

**PROFIT SHARING AGREEMENT**

This **PROFIT SHARING AGREEMENT** (this "**Agreement**") is entered into effective as of _____ __, 2025 ("**Effective Date**"), by and between BarbaraONeill.com LLC, a Wisconsin limited liability company ("**Owner**"), and Self Heal By Design L.l.c-fz ("**Payee**"). Owner and Payee are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

**RECITALS**

**WHEREAS**, on or about February 3, 2025, Barbara Esther O'Neill assigned all of her United States, Canada, and Mexico rights associated with her work as an author, speaker and promoter of health and wellness to Misty Mountain USA LLC ("**Misty Mountain**"), which includes without limitation rights in her books (which includes without limitation "Sustain Me," "Self Heal By Design," and "A Taste of Misty Mountain"), writings, presentations, speaking engagements and performances, the online website and retail store found at <barbaraoneill.com> ("**Barbara O'Neill Website**"), and various merchandise products, including without limitation clothing, headwear, bags, and stickers ("**Barbara O'Neill North America Business**"). Accordingly, in such assignment, Barbara Esther O'Neill irrevocably assigned to Misty Mountain all of her right, title, and interest in and to the following for the Barbara O'Neill North America Business arising and accruing under the laws of the United States, Canada, and Mexico (the "**Barbara O'Neill Assigned IP**"): (a) all existing and future copyrights, whether registered or unregistered, and exclusive copyright licenses; (b) all trademarks and service marks, including without limitation the trademark and service mark BARBARA O'NEILL (collectively referred hereafter as, the "**Barbara O'Neill Trademarks**"), together with the goodwill of the business connected with the use of, and symbolized by, the Barbara O'Neill Trademarks; (c) all rights of any kind whatsoever of Barbara O'Neill accruing under any of the foregoing provided by applicable law of the United States, Canada, and Mexico; (d) all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (e) all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the effective date of such assignment, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, violation, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

**WHEREAS**, on or about February 26, 2025, Misty Mountain assigned all of its rights associated with its business of promoting and providing education about health, beauty, and wellness through the works and teachings of Barbara O'Neill as well as offering and selling various consumer products ("**Misty Mountain Business**") to Owner. Such assignment included without limitation the Barbara O'Neill Assigned IP as well as other intellectual property rights owned by Misty Mountain, including without limitation: (a) its existing and future copyrights in works of authorship; (b) trademarks, service marks, and other indicia of source or origin, including without limitation the marks EMMA MAGNOLIA, the Three Mountains Logo, and the Gumnuts Logo ("**Emma Magnolia Trademarks**"); (c) internet domain name registrations and social media account or user names incorporating any of its trademarks, service marks, or other indicia of source or origin and all associated web addresses, URLs, websites and web pages (including without limitation the Barbara O'Neill Website), and social media sites and pages, and all content and data thereon or relating thereto; and (d) all other rights, privileges, and protections of any kind whatsoever of Misty Mountain accruing under any of the foregoing provided by any applicable law, treaty, or other international convention throughout the world (the foregoing is collectively referred to as the "**Emma Magnolia IP**").

**WHEREAS**, as consideration for the Parties' collaboration, Owner has agreed to, among other things, pay Payee a certain share of certain sales or other dispositions of the Works (*as defined below*), on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the above and the mutual representations, warranties, covenants and agreements set forth herein, the Parties hereby agree as follows:

**AGREEMENT**

1.      **Definitions.** Unless the context requires otherwise, words in the singular include the plural, words in the plural include the singular, and words importing any gender shall be applicable to all genders. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). In addition to the capitalized terms otherwise defined in this Agreement, the following capitalized terms shall have the meaning set forth in this section:

*"Affiliate"* means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. For purposes of this definition, *"control"* means the possession, directly or indirectly, of the power to elect at least fifty percent (50%) of the governing board of such Person or to direct or cause the direction of the management and policies of the Person, whether through ownership of voting securities, partnership or limited liability interests, nonprofit membership, contract or otherwise.

*"Assets"* means the Barbara O'Neill Assigned IP and the Emma Magnolia IP collectively.

*"Governmental Authority"* means any federal, state or local government or subdivision thereof, or any agency or instrumentality of such government or subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction

*"Net Sales"* means the aggregate gross revenues received by Owner from the sale of the Works, to an unaffiliated third party in an arm's length transaction, reduced by allowances, return credits, and any amounts incurred by or paid by Owner for any taxes, costs, and expenses in connection with the marketing, distribution, publication or sale of the Works. "Net Sales" shall not include sales or transfers between Owner and its Affiliates, assignees or licensees.

*"Person"* means an association, corporation, individual, partnership, limited liability company, Governmental Authority, trust, association, or any other entity or organization.

*"Territory"* means each of Canada, Mexico and the United States of America and its territories.

*"Works"* means the books "Sustain Me," "Self Heal By Design," "A Taste of Misty Mountain," and "The Assassination of Barbara O'Neill." And any future books.

2.      **Payment and Sales**. Subject to the other terms of this Agreement, during the Term, Owner shall pay to Payee a fixed percentage of quarterly aggregate Net Sales of the Works in the Territory according to the following schedule (the "**Payment**").

Profit Sharing Agreement

(a) **Payment; Sale of Works**: Owner shall pay to Payee an amount equal to fifteen percent (15%) of all Net Sales of Works that have been sold by Owner to any third party in the Territory. Such Payments will accrue when a copy of a Work has been paid for by the third party. Owner shall have the sole right to set the retail or sales price of the Works and may modify such price depending on the applicable event or sale channel. Without limiting the foregoing, Owner shall have the exclusive right to publish, print, market, distribute and sell the Works in the Territory through all relevant sales channels, including but not limited to: (a) wholesale stores; (b) physical retail stores; (c) its and its Affiliates' online retail stores; (d) third-party online retail stores (e.g., Amazon); (e) in-person events; and (f) other direct-to-consumer channels.

(b) **Payment of the Payments**. The Payments shall be made in US Dollars, and all references to Dollars or $ in this Agreement refer to US Dollars. The Payments shall be calculated on a quarterly basis annually, meaning the respective calendar months ending on March 31, June 30, September 30 and December 31, and such Payments shall become due and payable thirty (30) days following the last day of such quarter. All Payments owed under this Agreement shall be made by wire transfer or other acceptable means as determined and designated by Payee in writing. Payments made by wire transfer shall be wired to the bank and account designated in writing by Payee, which Payee shall designate in writing at least five business days prior to the date such Payment is due. The Payment shall be accompanied by a written statement showing in reasonable detail the Works sold or deemed sold by Owner in the preceding calendar quarter, the price of such Work, tax deductions and other pertinent information in sufficient detail to explain the calculation of the Payment.

(c) **Credits; Reserves**. Owner may take a credit against amounts payable to Payee for any returns for which royalties have been previously paid. If the balance due to Payee for any royalty accounting period is less than $1,000.00, no payment will be due until the next royalty accounting period at the end of which the cumulative balance has reached $5,000.00. Owner may retain a reasonable percent reserve against amounts payable to the Author for future returns for no more than four (4) royalty accounting periods, provided the accounting statements indicate the amount of the reserve and how it has been applied. Any amounts owed by Payee to the Publisher under this Agreement or any other agreement between Payee and Owner may be deducted from any payments due to Payee under this Agreement or any other agreement between Payee and Owner.

(d) **No Royalties/Payments**. Owner shall pay Payee no royalties/payments on copies of the Works sold to Payee, distributed for review, advertising, publicity, or sales promotion, sold at or below the cost of manufacture, or that have been damaged or destroyed. Owner shall not have any responsibility to Payee for any Payments or other remuneration for any sales of the Works unless such Works are sold by Owner or its designee in the Territory. Payee acknowledges it is not entitled to any royalties or any other payments involving or concerning the Assets other than as identified in this Agreement for the Works sold in the Territory.

(e) **Taxes**. Owner shall pay all taxes on the sale of any of the Works, which taxes may be deducted from gross revenues and included in the calculation of Net Sales. Payee acknowledges that if Owner is required by applicable law or regulation to deduct or withhold any taxes from the Payments to Payee, Owner will be entitled to deduct and withhold such taxes in accordance with such law or regulation. Notwithstanding the foregoing, Payee shall be solely responsible and liable for the payment of all applicable taxes and other assessments, if any, on all Payment amounts received by Payee under the terms of this Agreement.

3. <u>**Ownership; Payee Obligations**</u>.

(a)      **Acknowledgement of Ownership**. Payee acknowledges that: (i) Owner is the owner of all rights and title in and to the Barbara O'Neill Assigned IP in the Territory and all goodwill related thereto; and (ii) Owner is the owner of all rights and title in and to the Emma Magnolia IP throughout the world and all goodwill related thereto.

(b)      **No Challenge**. Payee shall not dispute or challenge, or assist any Person is disputing or challenging, Owner's rights in and to the Barbara O'Neill Assigned IP in the Territory. Payee shall not dispute or challenge, or assist any Person is disputing or challenging, Owner's rights in and to the Emma Magnolia IP.

(c)      **No Use of Barbara O'Neill Assigned IP in the Territory**. Payee acknowledges and understands that Owner is <u>not</u> granting any license to use the Barbara O'Neill Assigned IP in the Territory to Payee and is not transferring any ownership rights in the Barbara O'Neill Assigned IP in the Territory to Payee.

(d)      **Payee Restrictions**. Payee shall not, directly or indirectly:

i.      market, publish, or sell any of the Works in the Territory;

ii.      use or otherwise exploit any of the Barbara O'Neill Assigned IP in the Territory;

iii.      claim any ownership rights in or to, or any other rights to use, any of the Barbara O'Neill Assigned IP in the Territory;

iv.      apply for, or obtain, or assist any Person in applying for or obtaining, any registration with a Governmental Authority for the Barbara O'Neill Trademarks, or any trademark, service mark, trade name, or other indicia confusingly similar to the Barbara O'Neill Trademarks in the Territory;

v.      apply for, or obtain, or assist any Person in applying for or obtaining, any registration with a Governmental Authority for copyrights or any other intellectual property right associated with the Barbara O'Neill Assigned IP in the Territory;

vi.      apply for, or obtain, or assist any Person in applying for or obtaining, any registration with a Governmental Authority for the Emma Magnolia Trademarks, or any trademark, service mark, trade name, or other indicia confusingly similar to the Emma Magnolia Trademarks throughout the world;

vii.      apply for, or obtain, or assist any Person in applying for or obtaining, any registration with a Governmental Authority for copyrights or any other intellectual property right associated with the Emma Magnolia IP throughout the world;

viii.      take, omit to take, or permit any action which will or may dilute, tarnish, or bring into disrepute the reputation of, or goodwill associated with, the Barbara O'Neill Assigned IP;

ix.      infringe upon, or otherwise misappropriate, Owner's rights in and to the Barbara O'Neill Assigned IP and the Emma Magnolia IP.

(e)    **Non-Circumvention**. Payee shall not take any action, or fail to take any action or enforce any right, that is intended to, or would have the effect of, reducing Net Sales related to the Works. Without limiting the foregoing, Owner may introduce (whether by written, oral, data, or other form of communication) Payee to one or more opportunities to sell and distribute the Works in the Territory to third-party Persons (hereinafter an "**Opportunity**" or "**Opportunities**"). Payee acknowledges that the identity of the subject Opportunities, and all other information concerning an Opportunity (including without limitation, all mailing information, phone and fax numbers, email addresses and other contact information) introduced hereunder are the property of Owner, and will be treated as Confidential Information (*as defined below*) of Owner by Payee, it affiliates, officers, directors, shareholders, employees, agents, representatives, successors and assigns. Payee shall not use such information, except in the context of any arrangement with Owner in which Owner is directly and actively involved, and never without Owner's prior written approval. Without limiting the foregoing, except as directly through Owner, Payee shall not enter into or otherwise arrange any business relationship, contact any Person, or accept any compensation or advantage in relation regarding such Opportunity, or assist any Person in doing any of the foregoing, without the prior written approval of Owner. Owner is relying on Payee's assent to these terms and their intent to be bound by the terms by evidence of their signature. Without Payee's signed assent to these terms, Owner would not introduce any Opportunity or disclose any Confidential Information to Payee as herein described

(f)    **Non-Disparagement**. Payee shall not, during and after the Term: (i) publicly or privately, disparage or comment negatively about Owner, or its members, officers, directors, employees, policies or practices; and (ii) discourage anyone from doing business with Owner or encourage anyone to withdraw their business with, or purchases from, Owner.

(g)    **Non-Competition**. In order to protect Owner's Confidential Information (*as defined below*), which would cause irreparable harm to Company if disclosed to, or used on behalf of, a competitor, Payee shall not during the Term and perpetuity after the Term, directly or indirectly, engage or participate in any business activity or enterprise, whether as a proprietor, owner, principal, agent, partner, officer, director, stockholder, employee, lender, investor, manager, member, consultant, independent contractor, representative, joint venture, agent, advisor or otherwise that competes with Owner, or that could result in the disclosure or use of Owner's Confidential Information (the "**Restricted Business**"), in each case, anywhere in the Territory.

(h)    **Non-Solicitation**.  Payee shall not on behalf of Payee self or directly or indirectly through another person or entity (including without limitation as a proprietor, owner, principal, agent, partner, officer, director, stockholder, employee, manager, member, consultant or otherwise) during the Term and for perpetuity after the Term solicit, divert, take away, or otherwise attempt in any manner to solicit, divert, or take away, the business or relationship of any customer, client, or any potential  customer or client, supplier, distributor, dealer, referral source, business partner, service provider, consultant, lender, investor, landlord, licensor, agent, vendor or other business relation of Owner, in each case, with respect to the Restricted Business and within the Territory ("**Business Partner(s)**"), that Payee knows, or reasonably should know, is a Business Partner, or in any way interfere with the relationship between any such Business Partner and Owner (including, without limitation, inducing such person or entity to cease doing, or reducing, their business with Owner).

4.    **Representations and Warranties of Payee**. Payee represents and warrants to Owner, as of the Effective Date, that:

(a) **Organization**. Payee is a Dubai organization duly organized, validly existing and in good standing under the laws of Dubai, Saudia Arabia. Payee has all requisite power and authority necessary to enter into and perform its obligations under this Agreement.

(b) **Authority; Execution; Enforceability**. Payee has all requisite power and authority to execute, deliver and perform its obligations under this Agreement; no consent of any party is required for Payee to execute, deliver and perform its obligations under this Agreement; and the execution and delivery of this Agreement and the performance of all of its obligations under this Agreement have been duly authorized by Payee. This Agreement has been duly executed and delivered by Payee and constitutes the legal, valid and binding obligation of Payee, enforceable against Payee in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other laws of general application relating to or affecting creditors' rights generally.

(c) **No Violation**. The execution, delivery and performance of this Agreement by Payee, and Payee's compliance with the terms and conditions hereof, is not prohibited or limited by, and do not and will not conflict with or result in the breach of or a default under, any: (i) law, regulation, or other governmental order applicable to Payee; and (ii) provision of any contract, agreement or instrument binding on or affecting Payee, including any license agreements.

(d) **Financial Condition**. No insolvency proceeding of any character, including without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, has been commenced by or against Payee or any of its assets, nor has any such proceeding been threatened. Payee does not contemplate and has not taken any action in contemplation of the institution of any such proceeding.

6.      **Term.** This Agreement shall commence on the Effective Date and continue until the earlier of: (a) 12 months (the "**Expiration Date**"); or (b) the termination of this Agreement as provided in Section 7 below (the "**Term**"), at which time this Agreement shall be of no further force and effect. The Expiration Date may be renewed and extended by mutual written agreement of the Parties or the Term automatically renews if no Termination of this Agreement is provided as stated in Section 7 below, within 60 days of its expiration.

7.      **Termination.** This Agreement shall be terminated upon the earliest of the following: (a) (i) Payee's death, if an individual, or (ii) any of Payee's cessation of business, liquidation, winding up, bankruptcy or insolvency, if an entity, (b) the termination by Owner for "cause" (as defined below), (c) by mutual written agreement of the Parties, or (d) upon Owner's insolvency or cessation of business. As used in this Agreement, "cause" shall mean termination based on the good faith determination of Owner by upon (a) Payee's violation of any law, fraud, embezzlement, or dishonesty, deceptive conduct or knowing conflict of interest related to the affairs of Owner, its parent, affiliates, subsidiaries or related companies; (b) Payee's breach of any fiduciary duty or material legal or contractual obligation to Owner, which breach, if curable is not cured within seven (7) days after notice to Payee thereof, or if cured, reoccurs; (c) Payee being  convicted of or plea of nolo contendere to any federal or state criminal  felony or misdemeanor  involving moral turpitude; (d) conduct by Payee which publicly embarrasses, damages or injures the reputation of Owner, its officers, shareholders or members; (e) Payee's breach of the terms of the Agreement or the unlawful use, taking, infringement or misappropriation of Company's property (including any of the Assets); or (f) Payee being convicted of or plea of nolo contendere to any felony or misdemeanor relative to the affairs of Owner.

Profit Sharing Agreement

**8.    <u>Confidentiality</u>**.

(a)    **Confidential/Propriety Information**. As used in this Agreement, "**Confidential Information**" means this Agreement and all information that is disclosed by Owner to Payee and that relates to Owner's or a third party's business (including without limitation, business plans, financial data, customer information, marketing plans, strategic plans, recruiting targets and target areas of growth, etc.), technology (including without limitation, technical drawings, designs, schematics, algorithms, technical data, product plans, research plans, software, etc.), products, services, trade secrets, know- how, formulas, processes, ideas, or inventions (whether or not patentable), whether or not marked or otherwise indicated as confidential information. For purposes of this Agreement, such third-party Confidential Information shall be deemed to be Confidential Information of Owner. All Confidential Information is and shall remain the property of Owner.

(b)    **Duty of Confidentiality**. Payee shall not (i) copy the Confidential Information of Owner without the written consent of Owner, (ii) use the Confidential Information of Owner except in the reasonable execution of Payee's duties under this Agreement, or (iii) disclose the Confidential Information of Owner to any third party. Payee shall protect the Confidential Information of Owner with at least the same degree of care that Payee uses to protect its own confidential information, but in no event less than a reasonable standard of care.

(c)    **Exceptions**. Confidential Information does not include information that: (a) is or falls within the public domain without the fault of Payee; (b) was in the possession of Payee, without any obligation of confidentiality, prior to the receipt thereof from Disclosing Party; (c) is independently developed by Payee without use of or reference to the Confidential Information of Disclosing Party; or (d) is rightfully obtained from a third party without any obligation of confidentiality. Nothing in this Agreement will prohibit a Party from disclosing Confidential Information of the other Party if legally compelled to do so by judicial or governmental order or in a judicial or governmental proceeding (a "Compelled Disclosure"); provided, the compelled Party shall: (i)  give the other Party reasonable notice of such Compelled Disclosure prior to disclosure; (ii) cooperate with said other Party in the event that said other Party elects to contest such disclosure or seek a protective order with respect thereto; and (iii) in any event disclose only the precise Confidential Information, or portion thereof, that is the subject of the Compelled Disclosure.

(d)    **Injunctive Relief, Duty to Inform**. Payee acknowledges that due to the unique nature of the Confidential Information, there can be no adequate remedy at law for any breach of the obligations hereunder, that any such breach may allow Payee or third parties to unfairly compete with Owner to the irreparable harm of Owner, and that, therefore, upon any such breach or any threat thereof Owner will be entitled to appropriate equitable relief in addition to whatever remedies it might have at law. Payee shall notify Owner in writing immediately upon the occurrence of any unauthorized release of Confidential Information or other breach of this Section 8 of which it is aware.

(e)    **Return of Confidential Information**. At the end of the Term, or at any other time upon request by Owner, Payee shall promptly return to Owner, and not retain any copies (in any form whatsoever) of, all Confidential Information, however collected, stored or maintained, and all other records, files, memoranda, notes, designs, data, reports, price lists, client lists, drawings, plans, computer programs, software, software documentation, sketches, laboratory and research notebooks and other documents and materials (and all copies or reproductions of such materials) relating to the transactions contemplated by this Agreement.

**9.     Release.**  Payee, on behalf of Payee and Payee's attorneys, legal representatives, heirs, successors, and permitted assigns (collectively, the "**Payee Releasing Parties**"), hereby, irrevocably and unconditionally, fully and forever acquits, releases, covenants not to sue, and discharges and holds harmless, Owner and its Affiliates and its and their officers, managers, directors, shareholders, members, employees, agents, attorneys, representatives, predecessors, successors, and assigns (collectively, the "**Releasees**") from any and all actions, claims, charges, demands, losses, obligations, liabilities, costs, expenses (including attorneys' fees and court costs), causes of action, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature and kind that Payee or any of the other Payee Releasing Parties has, may have had, or may have in the future against any one or more of the Releasees, whether known or unknown, suspected or unsuspected, matured or unmatured, fixed or contingent, for, upon, or by reason of any matter or cause arising at any time at or prior to the Effective Date.  The release set forth in this Section 9 shall: (a) be binding upon Payee, each of the other Payee Releasing Parties, and each of their respective successors and assigns; and (b) inure to the benefit of the Releasees and their respective successors and assigns. For the avoidance of doubt, Payee acknowledges that Payee does not have any right of indemnification, contribution, or reimbursement from or remedy against Owner for any payments or reimbursements due and owing prior to the date of this Agreement.

**10.     Indemnification**.  PAYEE SHALL INDEMNIFY OWNER AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS AND HOLD THEM HARMLESS FROM ANY AND ALL CLAIMS, LIABILITIES, DAMAGES, COSTS OR OBLIGATIONS (INCLUDING REASONABLE LEGAL FEES AND DEFENSE COSTS) RESULTING FROM OR IN CONNECTION WITH ANY BREACH OR FAILURE BY PAYEE TO COMPLY WITH: (A) ANY TERM OR CONDITION OF THIS AGREEMENT, OR (B) ANY LAW, REGULATION OR GOVERNMENTAL ORDER.

**11.     General Provisions.**

(a) **Independent Contracting Parties**. The Parties are not joint venturers, partners, principal and agent, master and servant, or employer and employee, and have no relationship other than as independent contracting parties. Neither Party shall be a legal representative of the other or have the power to bind or obligate the other in any manner.

(b) **Amendment and Modification**. This Agreement may be amended, modified or supplemented only by an instrument in writing signed by the Party against whom such amendment, modification or supplement is sought to be enforced.

(c) **Waiver of Compliance; Consents**. The rights and remedies of the Parties are cumulative and not alternative and may be exercised concurrently or separately. No failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (i) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (ii) no notice to or demand on one Party shall be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement. Any consent required or permitted by this Agreement is binding only if in writing.

(d) **Notices**. All notices, consents, waivers, acceptances, rejections and other communications hereunder shall be in writing and shall be (i) delivered by hand, (ii) sent by email transmission, or (iii) sent certified mail or by a nationally recognized overnight delivery service, charges prepaid, to the address set forth below (or such other address for a Party as shall be specified by like notice):

If to Owner:    BarbaraONeill.com LLC
Attn.: Emma Loberg
257 230th Street
Baldwin, WI 54002
Telephone: (651) 295-8666
Email: emma@barabaraoneill.com

Copy to:    Frost Brown Todd LLP
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Attention: Derek Staub, Esq., and
Austin S. Conner, Esq.,
E-mail: dstaub@fbtlaw.com
aconner@fbtlaw.com

If to Payee, to:    Self Heal By Design L.l.c-fz
Attn.: Michael O'Neill
SG 3010 Sky Gardens, Park Avenue,
DIFC Dubai
Telephone: 01161-427-678-118
Email: Mike@mmh.com.au

Each such notice or other communication shall be deemed to have been duly given and to be effective (x) if delivered by hand, immediately upon delivery if delivered on a business day during normal business hours and, if otherwise, on the next business day; (y) if sent by email transmission, immediately upon confirmation that such transmission has been successfully transmitted on a business day before or during normal business hours and, if otherwise, on the business day following such confirmation, or (z) if sent by certified mail or a nationally recognized overnight delivery service, on the day of delivery if delivered during normal business hours on a business day and, if otherwise, on the first business day after delivery.

(e) **Publicity**. No Party shall issue any press release or any other form of public disclosure regarding the existence of this Agreement or the terms hereof, or use the name of another Party hereto in any press release or other public disclosure, without the prior written consent of the other Party, except for those disclosures and notifications contemplated by this Agreement or containing information previously approved for disclosure by the other Party or as required by any law and solely to the extent necessary to satisfy such legal requirement.

(f) **Assignment**. Payee shall not assign any of its rights or delegate any of its obligations under this Agreement, in each case whether voluntarily or involuntarily, by operation of law, or otherwise, without Owner's prior written consent. Owner may assign this Agreement or its rights hereunder, or delegate its obligations hereunder, only to a company acquiring all or substantially all of the Owner's assets.

Profit Sharing Agreement

(g) **Governing Law**. The execution, interpretation and performance of this Agreement, and any disputes with respect to the transactions contemplated by this Agreement, shall be governed by the internal laws and judicial decisions of the State of Texas applicable to contracts made and to be performed entirely within the State of Texas, exclusive of its conflicts of law rules.

(h) **Remedies.** The rights and remedies of Owner under this Agreement are cumulative. Without limiting the foregoing, Owner's rights and remedies are independent of, and in addition to, such rights and remedies as Owner may have at law or in equity or otherwise for any misrepresentation, breach of warranty, breach of representation, or failure to fulfill any covenant, agreement, or obligation hereunder on the part of Payee, including the right to seek specific performance, injunction, rescission or restitution, none of which rights or remedies shall be affected or diminished hereby.

(i) **Attorneys' Fees**. If legal action is commenced to enforce this Agreement, each Party shall pay its own costs and attorneys' fees in connection with any such action, however the prevailing party in any such action shall be entitled to recover all attorneys' fees of pursuing or defending an action under this Agreement.

(j) **Severability**. If any provision contained in this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, unless the invalidity of any such provision substantially deprives either Party of the practical benefits intended to be conferred by this Agreement. Notwithstanding the foregoing, any provision of this Agreement held invalid, illegal or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable, and the determination that any provision of this Agreement is invalid, illegal or unenforceable as applied to particular circumstances shall not affect the application of such provision to circumstances other than those as to which it is held invalid, illegal or unenforceable.

(k) **Construction**. Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

(l) **Incorporation of Recitals**. The Recitals hereto are an integral part of this Agreement and are hereby incorporated into this Agreement as if fully set forth herein.

(m) **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed on signature pages exchanged by facsimile, in which event each Party shall promptly deliver to the other such number of original executed copies as the other Party may reasonably request.

(n) **Rights Surviving Termination**. Any rights or obligations of the Parties in this Agreement which, by their nature, should survive termination or expiration of the Agreement, will survive any such termination or expiration, including without limitation intellectual property terms, representations and warranties, indemnification, and general provisions.

(o) **Entire Agreement**. This Agreement constitutes the entire agreement and understanding of the Parties hereto in respect of the subject matter hereof. This Agreement supersedes all prior agreements, understandings, promises, representations and statements between the Parties and their representatives with respect to the royalty and Payment contemplated by this Agreement.

**Signature Page Follows.**

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the Effective Date.

| Owner: | Payee: |
|---|---|
| **BarbaraONeill.com LLC,** <br> **a Wisconsin limited liability company** | **Self Heal By Design L.l.c-fz** |

By: <u>Emma Loberg</u>                                                  By: <u>Michael O'Neill</u>

Name: _____     Name: _____

Title: <u>Owner</u>                                    Title: _____

0159705.0799449   4927-3927-9399v3